

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00358-CV

_____

CITY OF WHITE SETTLEMENT, TEXAS, AND THE WHITE SETTLEMENT
ECONOMIC DEVELOPMENT CORPORATION, Appellants

V.

BENJAMIN S. EMMONS, AND SOURCE CAPITAL, LLC, Appellees

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-288516-16

Before Gabriel, Kerr, and Birdwell, JJ.
Opinion by Justice Birdwell

## MEMORANDUM OPINION

The City of White Settlement, Texas (City) and the White Settlement Economic Development Corporation (Corporation) (collectively the City Claimants) appeal from the trial court's interlocutory order granting Benjamin Emmons and Source Capital, LLC's special appearance motion, challenging the trial court's ruling in a single issue. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2017); Tex. R. Civ. P. 120a. We affirm the trial court's order in part and reverse it in part.

### I.     Background

#### A.     Construction of Water and Adventure Park

In September 2013, the City Claimants entered into a transaction with Hawaiian Parks – White Settlement, LLC (HPARKS) pursuant to which the City would ground lease land to HPARKS to construct a water and adventure park (the Park) and would pay up to $12.5 million for the construction, to be financed by debt obligations issued by either the City or the Corporation. HPARKS is a Missouri limited liability company directly owned by Horizon Family Holdings, LLC, a Missouri-based holding company with Texas offices. David Busch was the President of HPARKS and the founder and CEO of Horizon Family. Horizon Family owned companies that had entered into similar transactions with Mansfield, Garland, The Colony, Waco, Roanoke, and Pflugerville.

The ground lease agreement allowed HPARKS to encumber the leasehold interest and capital improvements but only with the City's consent, which the City

2

could not unreasonably withhold. Additionally, the City agreed, upon giving such consent, to "execute such subordination agreements as requested by lenders providing financing . . . for the cost of such Capital Improvements and personal property." The lease also provided that HPARKS would not transfer or assign any interest, or engage in any corporate merger, affecting the agreement without the City's consent, which the City could not unreasonably withhold. Further, the ground lease allowed the City to terminate upon an uncured default and provided that upon termination the City would hold title to any personal property that it had paid for "in whole or in part" but that HPARKS would "take title and ownership" of any personal property that it had paid for "entirely." The City Claimants and HPARKS also executed a separate construction agreement outlining the construction schedule and requirements for the Park.

When the parties entered into the ground lease and construction agreement, Horizon Family owed approximately $7.5 million to Capital One. To finance the Park and Pflugerville transactions, Horizon Family borrowed an additional $3.2 to $3.5 million from Source Capital Mezzanine Partners I, Source Capital Mezzanine Co-Investment Fund I, and the Gregson Trust (collectively, the Source Capital Lenders) in December 2013; that debt was subordinated to Capital One's loan. The Source Capital Lenders are affiliates of Source Capital, LLC, a Georgia limited liability company, and they make debt investments in other companies, such as Horizon Family. Emmons, a Georgia resident, is a partner in Source Capital and has been its

managing director since 2011; his duties and responsibilities consist of "evaluating lead and managing investments for Source Capital's various funds." He negotiated the Source Capital Lenders' December 2013 loan to Horizon Family.

**B.    Default Events and Source Capital's Attempt to Salvage Investment**

The Park opened in May 2014, but construction was not yet complete. In October 2014, while construction on the Park and the Pflugerville park was still ongoing, Horizon Family ran out of money and could not meet its past due obligations or complete construction. Capital One and the Source Capital Lenders issued notices of default on Horizon Family's loans by the end of that year. HPARKS failed to pay the October 2014 ground lease payment to the City, and according to Jim Ryan—who was at that time the City's Economic Development Director—the City was prepared to declare a default and terminate the lease pursuant to its terms.[1]

In December 2014, Emmons contacted Ryan, who became the City's Manager that same month. According to Ryan, Emmons told him about the loan defaults and stated that Horizon Family had also defaulted on its lease payments to the other six cities. He told Ryan "that he and Source Capital were attempting to reorganize the liabilities of Horizon Family and its subsidiaries (including HPARKS) which included[] the debt to Capital One, the rents owed to the 7 Texas cities as well as

---

[1]Philip Bray, the then-CFO of the City, averred that he was prepared to declare HPARKS in default after it failed to make both the October 2014 and April 2015 ground lease payments.

shortfalls in maintenance at the seven[] Hawaiian Falls water parks." Emmons sent the City a document with background about Source Capital as a company, a description of Horizon Family's financial situation, and a proposed investment solution. According to the document, Horizon Family was in danger of not being able to open any of the seven parks for the 2015 season, but Source Capital and Horizon Family had agreed to a new investment that would provide Horizon Family with adequate liquidity. The document described that agreement as follows:

- Source and Capital One will each provide capital to Horizon [Family] <u>to ensure all parks will open as scheduled</u>

- Source Capital will provide up to $5.0 million in new subordinated debt capital at closing of the transaction

- Upon closing the new investment:

    • Source Capital will become the majority owner of the Company

    • Dave Busch will remain as CEO, and along with key members of management, maintain significant equity upside

    • The Company will make installment payments on past-due rents owed to municipalities in April/May-plan to have **all** past due obligations paid by July 2015

    • The combination of Source's new investment and 2015 performance will ensure:

        1. The Company will be able to pay all past-due obligations associated with 2014

        2. The Company will be able to pay all 2015 rent obligations upon due date

5

3. The Company will be capitalized with adequate reserves for the 2015 off-season in preparation for opening in 2016

According to Ryan, Emmons requested that the City "not exercise its rights pursuant to the" ground lease and cooperate with Source Capital in the reorganization of the Horizon Family's and subsidiaries' financial obligations. According to Bray, Emmons told him that "Capital One had agreed to forbear putting its loan to Horizon Family and subsidiaries into default" and that "if Capital One had put [that] loan . . . into default and foreclosed on its collateral that Source Capital's debt would be wiped out."

Emmons, Bray, Ryan, and Matt Smith—a vice president of Source Capital who "support[ed] the partners on respective investments"—communicated about the proposed debt reorganization via email and phone from January through April 2015. Emmons attended a meeting at Ryan's City office in March 2015 to discuss the debt reorganization.[2] The parties disagree whether Emmons made any misrepresentations to the City Claimants at that meeting. Emmons claims he never acted in any capacity other than his official capacity on behalf of Source Capital. According to Ryan, confirmed in part by Bray, Emmons asserted at the March 2015 meeting that if the City agreed to forbear putting HPARKS into default under the ground lease and

[2]According to Ryan, Emmons also "appeared" at his City office on December 16, 2015 and March 24, 2016. Emmons admitted in interrogatory answers that he discussed the waterpark with City representatives at a March 2016 meeting at the City offices and that he discussed the ground lease and lease payments at a May 2016 City council executive session.

6

allowed it to continue operating the Park, Source Capital would (a) persuade Capital One to "forbear on its debt owned by Horizon Family and its subsidiaries," (b) provide sufficient money to pay HPARKS's trade vendors and to "bring maintenance of the water parks to the highest standard," (c) pay the October 2014 past due rent to the City, as well as the March and October 2015 rent payments, and (d) pay up to $5 million to assure the commitments in (a)–(c) occurred.

After the March 2015 meeting, Emmons sent a letter to the City, in which he outlined, as requested by Bray, "our plan going forward to stabilize [Horizon Family] and . . . make good on the obligations owed to the" City:

> • Source Capital and Capital One Bank have agreed to provide up to $1,000,000 ("Initial Capital Agreement") to ensure that all the parks are prepared for the opening in mid-May. The documentation is final and we will be closing on April 3.
>
> • Source and David Busch signed a Letter of Intent ("Source/Busch Capital Agreement") in which Source will be injecting up to $5,000,000 into [Horizon Family]. The documentation is in the legal process and we are targeting an April 30th close.
>
> • Upon closing of the Source/Busch Capital Agreement, Source Capital will be the controlling owner of Horizon Family [], and specifically as it relates to your team, the sole owner of [HPARKS].
>
> • Source will need a consent from the [C]ity . . . prior to close allowing for the change of control. We will be providing a standard consent document in the next couple of weeks.
>
> • Dave Busch will be remaining in his role as CEO and you should see no change in the day to day operations.
>
> • Upon the closing of the Source/Busch Capital Agreement we will make the 1st of 3 payments (May 15th/June 15th/July 15th)- each

payment will be for $191,333 for a total of $575,000. This will cover all the 2014 past due lease payments ($375,000) and the amounts owed to date for 2015 ($200,000).

• The remaining 2015 payment- $600,000- will be made as required in October of 2015.

Emmons also asserted that "this process . . . will ensure we are ready for the 2015 season and . . . [that] we have enough cash to resolve all the 2014 hold over obligations, handle the 2015 commitments as they come due, and carry enough reserves into the offseason."

According to Bray, in return for Emmons's representations, the City promised that it would not declare a default under the lease, that it would allow HPARKS to continue operating the Park, and that it would sign whatever documents were necessary to effect the financial reorganization of Horizon Family and its subsidiaries. According to Ryan, the City agreed to forbear from exercising its right to declare HPARKS in default "for a full year," to allow HPARKS to continue to possess and operate the Park, and to sign all debt reorganization documents requested by Source Capital.

**C.     City Claimants' Consent to Assignment of HPARKS's Ground Lease Interest and Change of Horizon Family's Ownership**

Throughout April and part of May 2015, Emmons, Smith, Bray, and Ryan communicated about what was needed from the City Claimants to effect the proposed solution to Horizon Family's default. Capital One agreed to extend the maturity date of its loan to December 31, 2015. Capital One and the Source Capital

8

Lenders made an initial loan to Horizon Family of around $900,000, which closed on April 2, 2015.

On May 12, 2015, the City Claimants signed a negotiated Consent to Mortgage of Leasehold with Capital One and a Consent to Change of Ownership with HPARKS. In the Consent to Mortgage of Leasehold, the City Claimants agreed that HPARKS could execute documents granting a lien on all of its right, title, and interest under the ground lease and that Capital One could foreclose on that interest in an event of default of its loan to Horizon Family. The City Claimants also agreed that on termination of the lease, they would enter into a new lease with Capital One on similar terms if so requested. The City Claimants represented to Capital One that the lease remained in effect and that HPARKS was not in default except with respect to (a) the October and December 2014 and the April 2015 payments, (b) the failure to file a statement of gross revenue, annual balance sheet, and statement of profit and loss when required under the lease, and (c) the existence of mechanic's liens against the Park. The City further acknowledged that it was the owner of the premises and Park "other than personal property paid for solely by" HPARKS. In the Consent to Change of Ownership, the City Claimants consented to the sale of one hundred percent of Horizon Family's equity to Source Horizon, LLC, a Georgia limited

9

liability company.[3] Thomas Harbin, a Georgia resident, signed the document on behalf of Source Horizon. All of the other cities signed similar consents.

The City Claimants and Source Capital also negotiated a Payment Agreement. A signed copy is not in the record, but in his deposition, Emmons testified that he "believe[d]" the parties had signed it. The agreement obligated Source Capital, "[s]ubject to the closing of" the sale of Horizon Family's interests to Source Horizon, to make or cause Horizon Family to make three payments to the City: in May 2015, June 2015, and July 2015 for a total of the $575,000 past due at that time.[4]

To complete the transaction, an entity named Source Horizon Funding raised $3.7 million and loaned it to Source Horizon to purchase Horizon Family's equity. According to Emmons, the rest of the $5 million was not funded because "based upon our model for the 2015 season, we believe[d] the 3.7 was sufficient." Emmons agreed that he was the "point person for the funds and the loan" with Horizon Family.

## D. HPARKS Defaults Again

Despite Horizon Family's receiving new loans and changing ownership, HPARKS failed to make good on its obligations to the City. According to Emmons,

---

[3]Source Horizon was formed in May 2015 for the sole purpose of taking over ownership of Horizon Family. The Source Capital Lenders and Source Horizon Funding are the equity owners of Source Horizon.

[4]The Payment Agreement obligations do not include the October 2015 ground lease payment.

Busch and Horizon Family "[m]utually agreed to part ways" in September 2015, and Clint Hill took Busch's place. Although HPARKS paid the past due 2014 and the first of the 2015 payments, it failed to make the October 2015 payment. Emmons stated that it was Horizon Family's decision not to make the payment. Emmons attributed the failure to make that payment to "[s]eason performance[;] [w]e didn't have liquidity to do it." According to the City, HPARKS also failed to pay the Park's vendors and properly maintain the Park.

In the fourth quarter of 2015, HPARKS sold arcade games from the Park and the Pflugerville park to raise additional money. Emmons claimed that "from management's perspective . . . no one wants to go to a water park and have a kid sitting inside." Emmons could not remember who decided that the games should be sold, but he agreed with the decision. He and Hill discussed whether the City's consent to the sale was necessary and decided that "it was within our rights to sell." They were aware that Ryan had questioned their right to sell the games. Hill hired a third party vendor who removed and sold the games. According to Bray and Ryan, the City had purchased all of the personal property in the Park, including the arcade games.

In December 2015, Horizon Family entered into a sale/leaseback transaction with STORE Capital, a publicly traded REIT, that allowed Horizon Family to pay back all of its debt to Capital One. That transaction is secured by the interest in the

11

Waco, Roanoke, and Mansfield parks.[5] Horizon Family eventually sold the Pflugerville park.

All of the cities except the City were paid the 2015 lease rents in full. According to Emmons, "if we were going to continue to operate the . . . [P]ark we needed help from the City. The [P]ark needed to generate positive operating park income. And at that point in time, we would be in a position to start paying on the outstanding obligations to them."

The City notified HPARKS of its default under the lease on February 18, 2016. Because HPARKS failed to remedy the default after sixty days, the City terminated the lease.

## E.     City Claimants Sue

In October 2016, the City Claimants sued HPARKS, Emmons, and Source Capital. They amended their petition twice and added Hill as a party. In their second amended petition, the City Claimants alleged that Emmons and Source Capital (collectively the Source Capital Defendants) falsely represented that the City Claimants would benefit by forbearing default remedies under the ground lease, consenting to Capital One's security interest in HPARKS's ground lease interest, and consenting to the change in Horizon Family's ownership because the City would be

---

[5]Horizon Family had entered into another longterm sale and leaseback with CNL, a large REIT, before the Source Capital Lenders made the 2013 loan. That transaction was secured by the interest in The Colony and Garland parks.

paid all outstanding rent obligations, the future October 2015 lease payment would be paid, and HPARKS would be able to "carry enough reserves into the off-season for operating expenses." The City Claimants contended that their agreement to forgo the ground lease's default remedies, consent to Capital One's security interest, and consent to the change in Horizon Family's ownership was part of a "Workout Agreement" with the Source Capital Defendants and Capital One, under which Capital One would refrain from foreclosing before the end of 2015 and Source Capital would "advance an additional 5 million dollars to pay past due rents due on the waterpark leases[,] operate the [waterparks in all the seven cities] through the end of 2015," and "refinance the debt of Horizon [Family] by the end of 2015 or sell the parks and pay off the debts of Horizon" Family. The City Claimants alleged that after the Source Capital Defendants obtained their consents, instead of making the October 2015 lease payment and ensuring that the Park had enough income, the Source Capital Defendants diverted HPARKS's income to operate the other parks owned by Horizon Family. The City Claimants also contended that the Source Capital Defendants failed to maintain the Park as promised and that Hill and Emmons wrongfully sold all of the City-owned arcade games. Accordingly, the City Claimants brought causes of action against the Source Capital Defendants for breach of contract, promissory estoppel, fraud, and negligent misrepresentation, and against Emmons and Hill for conversion and violation of the Texas Theft Liability Act (TTLA).

13

As jurisdictional facts, the City Claimants alleged generally that the Source Capital Defendants had been doing business in Texas. They also alleged that Emmons had personally availed himself of the court's jurisdiction "based on [his] numerous communications and visits" and because he "committed a fraud and/or negligent misrepresentation when he caused [the City Claimants] to enter into an agreement, in Texas, based on false pretenses." Additionally, they alleged that Source Capital was subject to the trial court's jurisdiction because of Emmons's and Smith's "numerous communications" and visits to Texas and Emmons's fraudulent or negligent misrepresentation that caused the City Claimants to enter into an agreement in Texas based on false pretenses. The City Claimants further alleged that in addition to being managing director of and a partner in Source Capital, Emmons "was and is an investor and limited partner in one or more of the Source Capital Lenders and a managing member of the general partner entities of certain of the Source Capital Lenders. As such, . . . Emmons has a personal financial interest in Source Capital and the Source Capital Lenders."

The Source Capital Defendants filed a special appearance and first amended special appearance, which they supported with evidence. The City Claimants responded and presented their own evidence. The trial court granted the special appearance without holding a live hearing.

## II. Law on Personal Jurisdiction

A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Texas long-arm statute and of due process under the Fourteenth Amendment are satisfied. U.S. Const. amend. XIV, § 1; Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 2015); *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1779 (2017); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016), *cert. denied*, 137 S. Ct. 2290 (2017). The Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in Texas, which includes contracting with a Texas resident for performance in whole or in part in the state and committing a tort in whole or in part in the state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1)–(2); *TV Azteca*, 490 S.W.3d at 36. Due process is satisfied when (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BNSF Ry. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017); *TV Azteca*, 490 S.W.3d at 36. In determining whether federal due process requirements have been met, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own state's decisions. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *TravelJungle v. Am. Airlines, Inc.*, 212 S.W.3d 841, 845–46 (Tex. App.—Fort Worth 2006, no pet.).

The United States Supreme Court has distinguished two types of jurisdiction, depending on the types of contacts: general (all-purpose) jurisdiction and specific

(case-linked) jurisdiction. *BNSF Ry.*, 137 S. Ct. at 1558. Here, the City Claimants contend that the trial court may exercise specific jurisdiction over the Source Capital Defendants. A trial court may exercise specific jurisdiction over a defendant only if the suit arises out of or relates to the defendant's forum contacts. *Id.* In other words, specific jurisdiction depends on the existence of activity or an occurrence that takes place in the forum state and is therefore subject to its regulation. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851 (2011).

A plaintiff establishes that a defendant has minimum contacts with a forum by showing that the defendant "purposeful[ly] avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 886 (Tex. 2017). Three principles govern the purposeful-availment analysis: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be purposeful and not random, isolated, or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction so that it impliedly consents to suit there. *Id.* (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). The defendant's direct acts within Texas or conduct outside of Texas must justify a conclusion that it could reasonably anticipate being called into a Texas court. *Id.*

Even when a nonresident has established minimum contacts with a state, due process permits the state to assert jurisdiction over the nonresident only if doing so comports with traditional notions of fair play and substantial justice. *TV Azteca*, 490 S.W.3d at 55. Typically, "[w]hen a nonresident defendant has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of that forum's courts." *Id.* (quoting *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010)). Thus, "[i]f a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Id.* (quoting *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154–55 (Tex. 2013)).

We nevertheless consider several factors to evaluate the fairness and justness of exercising jurisdiction over a nonresident defendant who is a United States citizen: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies. *Id.* at 155. "To defeat jurisdiction, [the defendant] must present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Id.* (quoting *Spir Star,* 310 S.W.3d at 878–89).

17

## III. Parties' Burdens in Trial Court and Appellate Standard of Review

Whether a trial court has personal jurisdiction over a defendant is a question of law, which we review de novo based on all of the evidence. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). At trial, the plaintiff bears the initial burden to plead sufficient allegations that would permit the trial court to exercise personal jurisdiction over a defendant. *Id.* Once the plaintiff has done so, the defendant bears the burden to negate all potential bases for personal jurisdiction pleaded by the plaintiff. *Id.* The defendant can negate jurisdiction on a factual basis by presenting evidence that he has no contacts with Texas, effectively disproving the plaintiff's allegations; the plaintiff risks dismissal of its suit if it does not present the trial court with evidence affirming its jurisdictional allegations and establishing personal jurisdiction over the defendant. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). The defendant can also negate jurisdiction on a legal basis by showing that even if the plaintiff's alleged jurisdictional facts are true, (1) those facts are not sufficient to establish jurisdiction, (2) the defendant's Texas contacts fall short of purposeful availment, (3) the claims do not arise from the defendant's Texas contacts, or (4) exercising jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *Id.* Specific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis unless all claims arise from the same forum contacts. *Moncrief Oil*, 414 S.W.3d at 150–51 (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006)).

## IV. Special Appearance Evidence

The parties attached numerous documents to their special appearance pleadings, including affidavits from Emmons, Smith, Bray, and Ryan; the ground lease and construction agreement; the consent documents; excerpts from Emmons's deposition; letter and email correspondence; and press releases and other publicity documents.

### A. Emmons's Affidavit

In his affidavit and supplemental affidavit, Emmons averred the following:

- He has been a Georgia resident since 2005;

- He has never lived in Texas, maintained a place of business in Texas, owned property in Texas, or had a bank account in Texas;

- He has no individual or personal contacts with Texas;

- His only contacts with Texas and the City Claimants have been in his official capacity as managing director of Source Capital;

- He has never committed a tort against the City Claimants in Texas or elsewhere;

- He visited the City in his official capacity as managing director of Source Capital to discuss the terms of the ground lease, consent to mortgage of leasehold, and consent to change of ownership;

19

- In his official capacity and in the course and scope of his employment, at the March 2015 meeting, he discussed with the City Claimants "the future payment of $600,000, due and owing on October 1, 2015" and "a level of investment into Horizon" Family;

- He did not represent to either the City or Corporation that he or Source Capital would inject up to $5 million in Horizon Family or HPARKS;

- He did not represent to either the City or Corporation that he or Source Capital would make an additional cash injection of $1 million;

- He has not, in his official capacity as managing director of Source Capital, made any payments to any entity in Texas in relation to the allegations in the suit, been a party to any contract with the City Claimants, or been a party to any contract formed in Texas or with a Texas entity; and

- He is not aware of any "Workout Agreement," or related promises, and he did not initiate or conduct negotiations, make any promises leading to, or engaging in any acts that could be construed as performing any "Workout Agreement."

**B.    Smith's Affidavit**

Smith averred in his affidavit that

- Source Capital is a Georgia limited liability company and its sole members—Tom Harbin and Kate Harbin-Clammer—are residents of Georgia and California, respectively, and have never been Texas residents;

- Source Capital is not registered to do business in Texas, does not do business in Texas, has never maintained a place of business in Texas, has never acquired property in Texas, and has never maintained a bank account in Texas;

- Source Capital has never committed a tort against either of the City Claimants in Texas or elsewhere;

- Source Capital made no representation that it would inject up to $5 million in Horizon Family or HPARKS or that it would make an additional cash injection of $1 million;

- Source Capital has not been a party to any contract formed in Texas or with a Texas entity, and it has not been a party to any contract with the City Claimants;

- Source Capital is not aware of any agreement known as a "Workout Agreement" or any promises related to such an agreement, and it did not initiate or conduct negotiations, make any promises leading to, or engage in any acts that could be construed as performing any "Workout Agreement"; and

- Busch "remained the CEO at the time the Consents were executed" but "was terminated shortly thereafter due to reasons unforeseen and unrelated to the" ground lease and consents.

## C. Bray's Affidavit

The City provided an affidavit from Philip Bray, who was the City's chief financial officer from December 2011 to February 2017. According to Bray, the City purchased all of the personal property used in the Park. When HPARKS failed to make the April 2015 rental payment, he recommended to Ryan that the lease "be put into default and that the City retake possession of the [P]ark." Bray first became aware of Emmons "[d]uring late 2014 or early 2015." According to Bray,

> Emmons represented to me that he was the managing director of Source Capital, LLC; that Source Capital had injected some $3,500,000.00 into Horizon Family and its subsidiaries; that the Source Capital loan to Horizon Family was in default; that Capital One Bank in Fort Worth, Texas was the principal lender to Horizon Family and its subsidiaries; and that Capital One's loan to Horizon Family and its subsidiaries was also in default. Emmons represented that he and Source Capital had been authorized by Capital One to reorganize Horizon Family and its subsidiaries' debt. Capital One had agreed to forbear from putting its loan to Horizon Family and subsidiaries into default. Emmons acknowledged that if Capital One had put its loan with Horizon Family and subsidiaries into default and foreclosed on its collateral that Source Capital's debt would be wiped out.

Bray also averred that while he was in his office in White Settlement, he had "numerous telephone communications and email communications with Emmons and . . . Smith about the financial reorganization issues." According to Bray, he specifically requested the March 2015 letter from Emmons "to confirm the promises he made to me and . . . Ryan" during the March 2015 meeting:

> In the meeting Emmons specifically represented to us that Source Capital would advance up to an additional $5,000,000.00 to catch up on the Horizon Family and subsidiaries' financial obligations. Emmons

22

specifically promised that the unpaid vendors that provided services and products to the Park would be paid; that past due rents and future rents through 2015 would be paid; and that the maintenance of the Park would be at the highest level.

Bray said that in return, the City promised not to declare the lease in default, allowed HPARKS to continue to occupy the Park, and agreed to sign any necessary documents to effect the financial reorganization. Bray further said that he never gave Emmons, Smith, or anyone else at Source Capital or Horizon Family permission to remove the Park's arcade games.

### D.    Ryan's Affidavit

Ryan averred that the City borrowed $12 million to provide the financing for the construction of the Park and "all personal property necessary for [its] operation" and that the City owned the Park and "all equipment located [there] necessary for its operation." According to Ryan, the City was prepared to terminate the lease and bring "any other legal actions necessary to remedy the damages" after HPARKS failed to make the October 2014 rental payment. Ryan further averred as follows:

> 7. In December of 2014, I was contacted by Ben Emmons who stated that he was the managing director of Source Capital, LLC. Emmons stated that Source Capital had injected $3,500,000.00 to Horizon Family during 2013 and that Source Capital's debt with Horizon Family was in default. Emmons also stated that the senior lender to Horizon Family was Capital One bank in Fort Worth, Texas and that this debt was similarly in default. Emmons stated that the rental obligations to the other six Texas cities were in default as well, Emmons stated that he and Source Capital were attempting to reorganize the liabilities of Horizon Family and its subsidiaries (including HPARKS) which included: the debt to Capital One, the rents owed to the 7 Texas

23

cities as well as shortfalls in maintenance at the seven[] Hawaiian Falls water parks. . . .

8. Emmons requested that White Settlement not exercise its rights pursuant to the [ground lease]. Emmons requested that the City cooperate with him and Source Capital in reorganizing the Horizon Family and subsidiaries' financial obligations.

9. During the period of time from December 2014 through April 2015, I had numerous telephone conversations with Emmons as well as Matthew Smith. Smith was Emmons' assistant. Emmons and Smith told me that Source Capital's offices were located in Atlanta, Georgia. I was always in my office at White Settlement when I talked to Emmons and Smith. The topics I discussed with Emmons and Smith included the following: the [l]ease; the amounts owed to the City by HPARKS; and operations of the Park. The principal topic of conversation was how the debt reorganization being advanced by Source Capital could benefit not only Horizon Family and HPARKS, but how the City of White Settlement could benefit as well.

10. There were also numerous email exchanges between myself on the one hand and Emmons and Smith on the other hand. All these emails were directed to us at our offices in White Settlement. . . . . The topic[] discussed in our email traffic was Horizon Family and subsidiaries' debt restructuring.

11. Emmons made at least 3 trips I personally know of to the State of Texas during the 2015-2016 timeframe. Emmons appeared at my office in White Settlement on or about March 22, 2015. He also appeared at my office on December 16, 2015 and at the Park on March 24, 2016.

12. Emmons told me that he was also communicating with representatives of all of the other 6 cities included in the Hawaiian Falls water park network. He stated that he had visited with other cities while in Texas; and that he made telephone and email communications with each of these cities in the state of Texas. Emmons stated that for the reorganization to work, all 7 cities would have to cooperate.

13. During telephone conversations and face to face meetings, Emmons made the following representations to me and other members of my staff:

a. If White Settlement agreed to for[]bear putting HPARKS into default on the [l]ease . . . and allow HPARKS to continue to operate the Park at White Settlement, Source Capital would undertake to do the following matters:

i. Persuade Capital One to for[]bear on its debt owed by Horizon Family and its subsidiaries;

ii. Provide sufficient money to pay the trade vendors of HPARKS and bring maintenance of the water parks to the highest standard;

iii. Source Capital would pay the October 2014 rent to White Settlement as well as the rent accruing in March 2015 and October 2015; and

iv. Source Capital would pay up to $5,000,000.00 to assure the abovereferenced financial commitments could be performed.

14. The promises made by Emmons were made to me and my staff in my office. Phillip Bray, the chief financial officer at the City of White Settlement, requested that Emmons confirm his promises at this meeting. . . .

15. Relying on the promises of Emmons and Source Capital, the City of White Settlement did the following:

a. The City agreed to for[]bear from exercising its right to put HPARKS into default and take over operations of the Park for a full year.

b. The City agreed to sign all debt reorganization agreements requested by Source Capital including the various consents attached hereto as Exhibit "E". These exhibits are all true and correct copies of the original documents approved by the City at Emmons and Source Capital's request.

25

c. The City allowed HPARKS to continue to possess and operate the Park at White Settlement.

16. All the material promises made by Emmons and Source Capital referenced in paragraphs 13 and 15 above were not kept. Specifically, Source Capital did not pay the $600,000.00 rental payment due in October 2015. Source Capital did pay all of the other Texas cities rents through 2015, only White Settlement was excluded. Also, Source Capital failed to pay the trade creditors of the Park at White Settlement. Source Capital also failed to assure that the Park was properly maintained.

17. During the summer of 2015, I had numerous telephonic discussions with Emmons and Clinton Hill about the personal property located at the Park. Clinton Hill is the manager appointed by Horizon Family to run the 7 water parks in Texas. I made it very clear to Emmons and Hill that the City of White Settlement paid for and was the owner of all the personal property located at the Park. The City was, therefore, the owner of all the personal property located at the Park, specifically including all of the arcade games.

18. During October 2015, all of the arcade games as well as other personal property located at the Park were removed from the Park. Neither I nor anyone under my supervision gave permission to anyone to remove the arcade games from the Park. Despite the City paying for the arcade games, Clinton Hill told me that the arcade games were actually leased and were being returned. Nevertheless, Emmons and Source Capital instructed that the arcade games be removed from the Park and sold to defray expenses of other water parks. I vigorously objected to these activities by Emmons and Hill.

**E.    Emmons's Deposition**

Both parties attached excerpts from Emmons's deposition. Pertinent to jurisdiction, he testified that he traveled to Texas in 2013 to tour three of the Horizon Family water parks before the Source Capital Lenders loaned the initial $3.2 million. He also spoke with Ryan by phone. Emmons could not remember but assumed that

26

the Source Capital Lenders would have taken a blanket lien on all of Horizon Family's assets at that time, including its ownership interest in HPARKS, as collateral.

When asked why he personally would contact Horizon Family's creditors when Horizon Family defaulted on its loans, Emmons answered, "[B]ecause . . . part of the transaction was to allow for the company through the new investment and a normal operating season to pay back the obligations that were outstanding at that point in time." In addition to attending the March 2015 meeting with Ryan and Bray, Emmons attended a meeting with City representatives in City offices in March 2016 and a City council executive session in May 2016. He also attended two Mansfield city council meetings, a Roanoke city council meeting, and met with the city manager and mayor of Roanoke. Emmons "had conversations with" the other six cities about the restructuring plan and visited Mansfield and Pflugerville to get the necessary consents to the change of ownership. Emmons admitted that after the May 2015 closing, he and Smith became members of the Horizon Family's Board as representatives of Source Horizon; although he never expressly admitted he attended one of those Board meetings, we can infer from his answers in the excerpted pages that he attended at least one Board meeting in The Colony either at the end of 2015 or in early 2016.

Emmons denied personally selling the arcade games, but he said that he had agreed with Hill that they should be sold in "our best interest." After discussing the matter with Hill, Emmons believed that HPARKS could legally sell the games without

27

first getting the City's consent. He believed the games belonged to a Horizon Family entity.

Emmons said that at the end of 2015, a sale of the Pflugerville park appeared to be imminent, so Smith instructed Horizon Family's CFO to pay the rent for that park because the sale could not go through if the rent was not current and because if the sale fell through, Horizon Family would still want to operate that park. But Smith also instructed the CFO not to pay the October 2015 Park rent to the City because to continue operating it, HPARKS would need the City's help and could not start paying the City until the Park generated positive income. According to Emmons, the October 2015 payment to the City was not paid because the Park did not make enough income during the 2015 season.

Emmons also testified about how Source Capital funds the investments it identifies and facilitates:

> Q. So [Source Capital] has access to sources of money for this type project, the Hawaiian Falls-type project?
>
> A. So the Co-Investment Fund -- just to clarify. The Gregson Trust is a trust for Tom and Kate Harbin's mother. So she invested as an LP, as a lender – I shouldn't say an LP -- as a lender in that transaction.
>
> The Co-Investment Fund and the Source Capital Mezzanine Fund I were funds that raised money from approximately -- and I'm going to guess here -- but 50 entities, some of which were individual investors, some of which were family offices that invested in our fund.
>
> That fund -- those funds were then deployed -- are deployed by those -- by those entities into various companies. And on this list some

28

of these are Fund I and Co-Investment investments. Some of these are Fund II investments.

So we raised a second fund in late '14, closed on it in '15, and started making investments in it. So there are transactions on this list of current investments that were made out of the entity or the entities that invested in Horizon Family Holdings and some that invested out of Source Capital – Source Capital Mezzanine Fund II.

Q. Did Source Capital earn a fee by virtue of this loan closing in December 2013 with Hawaiian Falls?

A. No, Source Capital didn't.

Q. How does Source Capital make money?

A. . . . [F]or each fund, there will be a general partner. Okay? That general partner -- and this is typical of most fund structures. That general partner will invest -- those individuals that are in the GP will invest in the fund.

In addition to that, they will earn what is called carry on investments, dollars returned that are above a certain threshold. Each fund has an entity such as that. Those entities pay salaries, pay expenses, and in certain cases earn fees.

So when we do a transaction on the Mezzanine side, a portion of the closing fee -- and I forget what the closing fee was on this specific deal -- would have gone to the . . . advisor fund . . . .

. . . .

I was an employee of the Mezzanine Fund, . . . but I'm not sure if that's still the case.

. . . .

Q. Does -- who on behalf of any of the three lenders negotiates loans?

A. On behalf of the Mezzanine Fund and Co-Investment Fund, I would or Tom would.

Q. And you're -- and you're -- when you do that you're being paid by whom?

A. We are -- we are lending the money on the benefit of the fund. There is -- there is an advisor, a fund advisor for each -- for the funds, for Fund I and the Co-Investment Fund that we're part of and part of our role, part of the reason that we could carry in the result of those funds is because we manage the investments for those funds.

Q. You say "we." Who is we?

A. Myself, Tom.

Q. Right. And so you and Tom, when you manage this work for the funds, who are you working for?

A. We're working on behalf of the funds.

Q. And you're authorized by whom to do that work?

A. The funds, the operating agreement of the funds.

Q. And you're paid by whom for this work?

A. We're paid by the fund through carry – we're not charged -- we charge them by -- so take a step back. Maybe this will be simpler. So the investors in the fund pay a management fee for us to invest their money. Okay? We charge two percent.

So for argument's sake that first fund and the Co-Investment Fund was about 20 million dollars. So on an annual basis those investors pay us 2 percent to invest that money o[n] their behalf. That covers overhead for myself and Tom and [Smith] to make these investments, manage these investments, on the behalf of the investors who are the LPs, limited partners.

Q. Okay. And that 2 percent is paid to whom?

A. That 2 percent is paid to the advisor.

Q. The advisor individually?

A. No. The advisor entity, which is the GP. So in a fund structure, if you raise 20 million dollars, the investors -- and I'm an investor in that fund -- okay? So I invest money in each deal and I get the coupon for that.

All investors other than -- well, all the investors pay 2 percent management fee. That fee is paid to -- to the GP so that it will manage those funds on their behalf. That helps cover overhead, cover salaries, et cetera.

. . . .

In addition to that, once the money starts being returned, the investors get a percentage above their initial investment first and then once that hurdle has been met, then the proceeds are distributed between the GP members, who are the individuals like myself who are managing that money on behalf of the various investors on an 80/20 split.

Q. So who collects the loans that are made on behalf of the three lenders, the three original lenders?

. . . .

A. In this specific case it's done by the same entity that's doing it for all the other investments that are made by Fund I and the Co-Investment Fund.

Q. All right. I'm trying to understand what Source Capital, LLC, does. Do you --

A. But Source Capital has nothing to do with those three entities.

. . . .

Q. Is Source Capital, LLC a servicer for the various lenders that you discussed today?

31

. . . .

A. No.

Q. So your testimony is that Source Capital, LLC, has absolutely nothing to do with the money that was lent to Hawaiian Falls?

A. That's correct.

Q. And the entity -- there has got to be a human being that represents these three original lenders and that human being is you, right?

A. Well, I'm designated in their operating agreement. The funds agreement, I'm designated . . . to manage the loan -- manage the investments made on that entity's behalf.

Q. And in your representation, you are employed by whom?

A. That's what I told you. I believe it's Source Capital Partners.

Q. All right. . . . Did you not tell me this morning that Exhibit 5 [the Power Point presentation] was provided to the various creditors of Hawaiian Falls including the Cities that participate in the water park venture?

A. I told you I suspected that was the case.

Q. And tell me why it is that we see Source Capital, LLC, printed on every page?

. . . .

Q. . . . Why -- if Source Capital, LLC, has nothing to do with this loan, why is it that Source Capital, LLC, is displayed in bold letters on the first page?

A. Source Capital, LLC, is our -- is our trade name.

Q. Okay. It's a trade name for what?

A. For the -- for the individuals that are there.

Q. Is there a registration somewhere, a trademark or an assumed name filing somewhere that shows that Source Capital, LLC is a tradename for somebody else?

A. I don't know. Never looked it up. I don't know.

## V.    Arguments on Appeal

The City Claimants essentially argue that the Source Capital Defendants induced them to defer exercising their default remedial rights under the ground lease and to give their consent to the Horizon Family debt restructuring and ownership change by falsely representing, among other things, that in exchange *Source Capital* would ensure that the October 2015 ground lease payment was made. This allegedly false misrepresentation, which the City Claimants assert Emmons made at the March 2015 meeting with the City in Texas—is the crux of their fraud and negligent misrepresentation claims against the Source Capital Defendants. The City Claimants alternatively pleaded that Emmons, representing both Source Capital and the Source Capital Lenders, promised to make, or cause to be made, an up to $1 million loan and an additional up to $5 million loan to Horizon Family and promised that the October 2015 ground lease payment would be made as part of a contract—independent of the ground lease—among Source Capital, Capital One, and the City Claimants, called the Workout Agreement. The crux of the City Claimants' breach of contract and promissory estoppel claims against the Source Capital Defendants are those alleged

33

promises made by Emmons in his representative capacity, primarily at the March 2015 meeting but also during the entire Workout Agreement negotiation process: "a six month period from late 2014 through May 2015." Finally, the crux of the City Claimants' conversion and TTLA-violation claims against Emmons is his alleged participation in and responsibility for the sale of the arcade games that the City claims it owns under the ground lease's terms.

## VI.    Analysis

### A.    Fraud and Negligent Misrepresentation Claims

The Source Capital Defendants contend that the trial court does not have specific jurisdiction over them with respect to the City Claimants' fraud and negligent misrepresentation claims because those claims "concern[] performance under the [c]onsents and restructuring of the debt—actions related to contracts to which Source Capital and Emmons were not parties or signatories and which did not involve any conduct from either in Texas." Additionally, the Source Capital Defendants also contend that Emmons's single Texas contact on which the City Claimants rely was insufficient to establish jurisdiction.[6]

---

[6]The Source Capital Defendants also make merits-related arguments, but we do not consider them in this special-appearance-ruling review; we instead analyze the quality and nature of their proven contacts in light of the City Claimants' pleaded tort claims. *See Michiana*, 168 S.W.3d at 790–92; *OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *9 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.).

A nonresident who, while physically present in the State of Texas, makes statements alleged to be fraudulent is subject to specific jurisdiction in Texas in a subsequent action arising from the statement. *Patel v. Pate*, No. 02-16-00313-CV, 2017 WL 2871684, at *5–6 (Tex. App.—Fort Worth July 6, 2017, no pet.) (mem. op.); *Jani–King Franchising, Inc. v. Falco Franchising, S.A.*, No. 05-15-00335-CV, 2016 WL 2609314, at *4 (Tex. App.—Dallas May 5, 2016, no pet.) (mem. op.). Additionally, a corporate representative's contacts undertaken on behalf of an entity are imputed to the entity for jurisdictional purposes. *See MasterGuard L.P. v. Eco Techs. Int'l LLC*, 441 S.W.3d 367, 378 (Tex. App.—Dallas 2013, no pet.); *Nikolai v. State,* 922 S.W.2d 229, 240 (Tex. App.—Fort Worth 1996, writ denied); *see also Holloway v. Skinner,* 898 S.W.2d 793, 795 (Tex. 1995) ("As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts."). Thus, we may impute Emmons's contacts with Texas to Source Capital.

Nevertheless, activity is sufficient to establish specific jurisdiction only if it creates a substantial connection with the forum state. *Walden v. Fiore*, 134 S. Ct. 1115, 1121–22 (2014); *TV Azteca*, 490 S.W.3d at 52–53; *Moncrief Oil*, 414 S.W.3d at 156. The relationship must arise from the purposeful contacts created with the state rather than with a state resident. *Walden*, 134 S. Ct. at 1122; *see Michiana*, 168 S.W.3d at 788–89. Mere injury to a forum resident is not a sufficient connection to the forum state. *Walden*, 134 S. Ct. at 1125 (citing *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482 (1984)).

35

Specific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's activity within the forum. *Moncrief Oil*, 414 S.W.3d at 156.

The City Claimants' tort claims against the Source Capital Defendants arise from alleged fraudulent or negligent misrepresentations Emmons made while he was physically present in the State of Texas in March 2015 and in a letter he sent Bray shortly thereafter. Although Emmons denies making any tortious misrepresentations at the March 2015 meeting, the City Claimants directly contradicted his denial with Bray's and Ryan's affidavits.

The evidence shows that Emmons was physically present at a meeting in Texas with the City Claimants at which he admits discussing the October 1, 2015 ground lease payment as well as the Source Capital-related investment in Horizon Family. This single contact did not create a substantial relationship with only a Texas resident. The Source Capital Defendants' primary focus in the Horizon Family debt restructuring was to protect the Source Capital Lenders' lien position that was at that time secured by assets in a Texas real property interest. A valid foreclosure of Capital One's loan would have extinguished the Source Capital Lenders' junior lien to the extent it was not satisfied from the proceeds of sale. *See Conseco Fin. Servicing Corp. v. J & J Mobile Homes, Inc.*, 120 S.W.3d 878, 883 (Tex. App.—Fort Worth 2003, pet. denied).

Further, the focus of the Source Capital Lenders' investment in Horizon Family was the construction and operation—through wholly-owned affiliates—of

36

water parks located throughout Texas, including the Park. The evidence shows that Emmons was the driving force in negotiating and completing the debt reorganization of Horizon Family on behalf of Source Capital and the Source Capital Lenders,[7] from whom he received compensation for managing the Texas-focused investment. And the income from operating the parks on real estate in Texas is what generated return on the investment. Therefore, applying the appropriate standard of review, we hold that the record shows that Source Capital purposefully availed itself of the privilege of conducting business and investment activity in Texas sufficient to confer specific jurisdiction on the trial court over the City Claimants' fraud and negligent misrepresentation claims. *See Cornerstone Healthcare Grp. Holdings, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 71–74 (Tex.) (holding that nonresident private equity fund limited partnerships and their general partner had sufficient minimum contacts with Texas necessary to establish specific jurisdiction over tortious interference claims against them when the funds—directed by their general partner—invested in a newly created Texas subsidiary that they formed for the sole purpose of purchasing a chain of Texas hospitals from a Texas company even though the funds and partnership

---

[7]The Source Capital Defendants admitted in their special appearance that Emmons met with the City Claimants in March 2015 "acting as the Managing Director for Source Capital and as an investor for Source Capital Mezzanine Fund, LP."

37

directed the Texas activity from Rhode Island), *cert. dism'd*, 137 S. Ct. 615 (2016);[8]

*Moncrief Oil*, 414 S.W.3d at 147, 153–54 (noting that business contacts needed to establish specific jurisdiction are a matter of "physical fact" and holding that defendants' voluntary attendance at two meetings in Texas at which they received trade secrets for purpose of considering joint venture in Texas with Texas company constituted sufficient contacts to establish jurisdiction for misappropriation of trade secrets claim);[9] *Nw. Cattle Feeders, LLC v. O'Connell*, No. 02-17-00361-CV, 2018 WL

[8]The Source Capital Defendants contend that *Cornerstone* is inapposite because they did not seek out the City Claimants in Texas, insure the City Claimants' assets, or profit from business in Texas. But this contention is merely an extension of the Source Capital Defendants' argument that none of their contacts are related to the City Claimants' claims because the Source Capital Defendants were not parties to the ground lease. Moreover, case law they rely on is inapposite because it does not involve allegations of tortious activity taking place physically in Texas. *But cf. Cooper Gay Martinez del Rio y Asociados de Reaseguro S.A. de C.V. v. Elamex, S.A. de C.V.*, No. 05-16-01436-CV, 2017 WL 3599690, at \*6–8 (Tex. App.—Dallas Aug. 22, 2017, no pet.) (mem. op.).

[9]The Source Capital Defendants attempt to distinguish *Moncrief Oil* from this case because in *Moncrief Oil* the defendants attended two meetings instead of one. But the number of meetings was not the focus of the court's analysis in *Moncrief Oil*; instead, it was the "physical fact" that the alleged tortious activity occurred while the defendants were physically present in Texas. 414 S.W.3d at 147, 153–54; *see also Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 849 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (noting significance of allegation that misrepresentation was made while defendant was physically present within Texas); *Stein v. Deason*, 165 S.W.3d 406, 415 (Tex. App.—Dallas 2005, no pet.) (op. on reh'g) (same). *But cf. M & F Worldwide Corp.*, 512 S.W.3d at 887 (distinguishing *Moncrief Oil* in part because "[t]he alleged misappropriation—the precise act giving rise to the tort—actually took place in Texas and it occurred in the process of the defendants' effort to get 'extensive business in or from the forum state'"). The Source Capital Defendants claim also that they were "simply investors" and not seeking to directly do business in Texas. But as we have pointed out, the focus of the investment, including the source

2976440, at *8–9 (Tex. App.—Fort Worth June 14, 2018, pet. filed) (mem. op.); *Patel*, 2017 WL 2871684, at *8; *Enright v. Asclepius Panacea, LLC*, No. 03-15-00348-CV, 2016 WL 1048881, at *5–7 (Tex. App.—Austin Mar. 8, 2016, no pet.) (mem. op.); *Hoagland v. Butcher*, 474 S.W.3d 802, 813–14 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 886–88 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 848–50 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The cases Source Capital relies on are distinguishable and inapposite. *See Searcy*, 496 S.W.3d at 62–63 (holding that trial court could not exercise specific jurisdiction over Canadian corporation when no allegedly tortious conduct on its behalf occurred in Texas but also holding that trial court could exercise specific jurisdiction over Bahamian entity when its executives allegedly engaged in tortious activity while physically present in Texas); *Atiq v. CoTechno Grp.*, No. 03-13-00762-CV, 2015 WL 6871219, at *6 (Tex. App.—Austin Nov. 4, 2015, pet. denied) (mem. op.) (holding that corporate representative's signing of contract, allegedly in his individual capacity, while physically present in Canada was not sufficient to establish jurisdiction over him as individual); *Cerbone v. Farb*, 225 S.W.3d 764, 769–71 (Tex. App.—Houston [14th Dist.] May 8, 2007, no pet.) (holding that plaintiff did not establish specific jurisdiction over corporate representative as individual when he signed note allegedly in his individual capacity while physically

---

of its repayment, was the construction and operation of the seven waterparks on real property in Texas, including the Park.

present in Illinois); *Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 582–83 (Tex. App.—Austin 2006, no pet.) (concluding that specific jurisdiction not established over individual as to tort claims because all of individual's allegedly tortious contacts occurred in California).

Emmons argues that none of his contacts with Texas may be used to establish jurisdiction over him because he undertook all of them in his representative capacity as managing director of Source Capital. But even if all of a corporate representative's actions are performed in his corporate capacity, the officer or member may also be subjected to personal jurisdiction and held liable in his individual capacity for those actions if they were tortious. *OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *9 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.); *Deaton v. Moreno*, No. 02-16-00188-CV, 2017 WL 4683940, at *5 (Tex. App.—Fort Worth Oct. 19, 2017, pet. denied) (mem. op.); *Niehaus*, 208 S.W.3d at 581. A corporate officer who had "direct, personal participation in the wrongdoing" so that he was the "'guiding spirit behind the wrongful conduct' or the 'central figure' in the challenged corporate activity" may not escape liability. *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.) (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)).

Emmons claims this individual-tort-liability exception does not apply here because the City Claimants have merely recast their breach of contract claims against HPARKS as tort claims against him. *See Abruzzo, LLC v. Walesa*, No. 04-12-00747-

40

CV, 2013 WL 1225626, at *4–5 (Tex. App.—San Antonio Mar. 27, 2013, no pet.) (mem. op.) (holding that because "the factual basis for the tort causes of action [DTPA, fraud in a real estate transaction, and common law fraud] . . . are alleged breaches of the provisions contained" in the contract between Abruzzo and Walesa, Walesa's contacts in his corporate representative capacity could not be independent torts that would confer specific jurisdiction over him). But although the City Claimants' tort claims are related to their contract with HPARKS, they did not plead that the Source Capital Defendants simply assured them that HPARKS would perform its contractual obligations. Instead, the City Claimants contend that the Source Capital Defendants induced them to give a consent under the HPARKS contract that they otherwise had a right to withhold if they had reasonable grounds to do so because the Source Capital Defendants misrepresented their intention to continue operating the Park. Thus, the City Claimants' tort allegations are not simply a recasting of their breach of contract allegations against HPARKS. We therefore hold that the record supports the conclusion that Emmons individually purposefully availed himself of the privilege of conducting activity in Texas sufficient to confer specific jurisdiction over him with regard to the City Claimants' fraud and negligent misrepresentation claims.

## B. Breach of Contract and Promissory Estoppel Claims

The City Claimants allege their breach of contract and promissory estoppel claims in the alternative: that instead of making misrepresentations at the March 2015

41

meeting and in the subsequent March 2015 letter and related email correspondence, Emmons made promises on behalf of Source Capital as part of a contract—the Workout Agreement—to which Source Capital itself—not the Source Capital Lenders[10]—was a party and which the Source Capital Defendants later breached. These claims are distinct from the City Claimants' tort claims although they arise from most of the same contacts. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("[I]t is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself."). But although the breach of contract and promissory estoppel claims are separate from the tort claims, our analysis of the relationship of the contacts as to Source Capital are similar: the City Claimants allege that Source Capital, through Emmons, solicited a contract with—or made promises to—them at a meeting in Texas, the proposed terms of which were memorialized in the March 2015 letter, negotiated by the parties over a six-month period, and closed with the signing of the consents and payment agreement.

We hold that Source Capital's alleged actions in negotiating a contract with, or making promises to, Texas entities while physically present in Texas and in telephone

---

[10]Therefore, Source Capital's reliance on *Suzlon Energy Ltd. v. Trinity Structural Towers, Inc.*, is misplaced because in that case there was no evidence of a contract between an Indian company and a corporation with its principal place of business in Texas, nor was there sufficient evidence that the Indian company acted as its indirect subsidiary's agent in forming the contract. 436 S.W.3d 835, 840–43 (Tex. App.—Dallas 2014, no pet.).

and email communications thereafter, concerning the investment in, liens on, and continued operation of a waterpark on Texas real property—which alleged contract required the Texas resident to forgo remedies and to take actions directly affecting its Texas real property subject to a ground lease and pursuant to which Source Capital made payments to a Texas municipality[11]—constituted purposeful availment sufficient to confer specific jurisdiction. *See Moncrief Oil*, 414 S.W.3d at 157; *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 192 (Tex. App.—Dallas 2015, no pet.) (holding that the operative facts of Salinas's breach of written contract claim "concern principally" the contract's terms); *Citrin Holdings, LLC v. Minnis,* 305 S.W.3d 269, 281 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 479, 105 S. Ct. 2174, 2185 (1985) ("[P]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."); *cf. Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 664–66 (Tex. 1987) (holding specific jurisdiction existed over nonresident joint venture when even though joint venture was entered into outside of Texas, purpose of joint venture was construction of hotel in Texas from which parties

---

[11]Source Capital admitted in the special appearance that "[t]o assist [HPARKS] in the debt restructuring, Source Capital paid . . . three payments that were due to [the City] . . . in May, June, and July 2015."

anticipated a profit), *cert. denied*, 484 U.S. 1063 (1988). Whether the alleged Workout Agreement actually existed, or whether Emmons actually made the alleged promises on behalf of Source Capital as alleged rather than on behalf of the Source Capital Lenders, involves resolution of the merits of the allegations and not the "physical facts" of jurisdiction.[12]

But although the City Claimants pleaded that Emmons breached the same contract and made the same promises on behalf of Source Capital, they did not allege that he had any individual contacts related to the breach of contract and promissory estoppel claims. The City Claimants expressly pleaded that these particular claims arose from promises Emmons made in his representative capacity as Source Capital's agent. They did not allege that Emmons was a party to the alleged Workout Agreement or that he made promises to undertake any activity individually in relation to the Workout Agreement. Additionally, the City Claimants did not plead any theory under which Emmons could be held personally liable for breaching Source Capital's alleged obligations under the Workout Agreement or related promises. *But cf. Hoagland*, 474 S.W.3d at 814 & n.10 (holding that trial court could exercise specific

---

[12]As with their other claims, the Source Capital Defendants argue that the record shows that they were neither parties nor signatories to the ground lease or any other contract with the City Claimants. But again, the City Claimants have pleaded that Source Capital is a party to the Workout Agreement, and we look only to whether the evidence supports their jurisdiction-related allegations in that regard, not whether the evidence supports the merits of the City Claimants' claims that the Workout Agreement existed.

jurisdiction over partner as individual when plaintiff specifically alleged that partner entered into separate agreement with him in individual capacity). Unlike in a tort context, a corporate agent who is not individually a party to a contract may not be held liable for breaching a contract to which only his principal is a party. *See Chico Auto Parts & Serv., Inc. v. Crockett*, 512 S.W.3d 560, 570–73 (Tex. App.—El Paso 2017, pet. denied); *cf. Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.) (holding that corporate representative could not be individually liable under promissory estoppel theory). *But cf. Savino v. Dodd*, 426 S.W.3d 275, 290–92 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (op. on reh'g) (holding that petition gave adequate notice that plaintiff was suing corporate representative individually under alter ego theory because he "made specific allegations . . . of actual fraud, including the commingling of funds, the diversion of company profits to an individual, and inadequate capitalization"). Because specific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's activity within the forum, and as to the breach of contract and promissory estoppel claims the City Claimants do not allege that Emmons entered into a contract with them or made promises in his individual capacity, we hold that the evidence does not support the exercise of specific jurisdiction over Emmons with respect to these two claims. *See Moncrief Oil*, 414 S.W.3d at 156; *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437–38 (Tex. 1982); *Furie Petroleum Co. v. Ben Barnes*

45

*Grp.*, No. 03-14-00181-CV, 2015 WL 6459606, at *5 (Tex. App.—Austin Oct. 23, 2015, no pet.) (mem. op.).

## C. Conversion and TTLA-Violation Claims

The City Claimants argue that Emmons's email direction to Hill to "Sell/sell/sell" the arcade games constitutes a sufficient contact as to their conversion and TTLA-violation claims—which they pleaded only against Emmons individually—because he directed an individual in Texas to commit a tort. This email, which Emmons sent to Hill from "benemmons@source-cap.com," was sent in response to Hill's assertion that HPARKS owned the games outright, and is part of an email chain among Hill, Emmons, Smith, and an individual with the company that at the time was acting as Horizon Family's CFO. In a later email from the same account, in response to Hill's inquiry about who would have a copy of the ground lease to verify Ryan's contention that HPARKS could not sell the games without the City's consent, Emmons states, "Matt should have."

Unlike the fraud and negligent misrepresentation claims, there is no evidence that these claims arise out of a tort Emmons committed while physically present in Texas. And although the ownership of the games arises under the terms of the ground lease, the effect of the loss of income from the sale of those games is primarily to the City financially and does not substantially impact the real property subject to the ground lease. Thus, the City Claimants' allegations amount to no more than that Emmons directed a tort at a Texas resident rather than at the State. *See Walden*, 134 S.

46

Ct. at 1125; *OZO Capital*, 2018 WL 1531444, at \*10–11; *Atiq*, 2015 WL 6871219, at \*7. We hold that the trial court did not err by concluding that Emmons did not purposefully avail himself of the benefits and protections of Texas law for purposes of the City Claimants' TTLA-violation and conversion claims when he stated in an email to Hill that the arcade games should be sold.

### D. Fair Play and Substantial Justice

Finally, the City Claimants contend that the trial court's exercising jurisdiction over the Source Capital Defendants—to the extent we have held that they have purposefully availed themselves of the benefits and protections of doing business in Texas—would not offend traditional notions of fair play and substantial justice. Balancing the relatively inconsequential burden to the Source Capital Defendants in traveling to and defending a suit in Texas against (1) Texas's strong interest in adjudicating a dispute involving investments in real-property related interests involving a Texas municipality, which would obtain the most convenient and effective relief in Texas, (2) the fact that torts against the municipality and related economic development corporation were allegedly committed in Texas, and (3) the fact that the most efficient resolution for the judicial system as a whole would be in Texas, we hold that the Source Capital Defendants failed to present a compelling case that it would be unreasonable for a Texas court to exercise jurisdiction over them.

We sustain the City Claimants' sole issue in part as to their claims against Source Capital for fraud, negligent misrepresentation, breach of contract, and

47

promissory estoppel and as to their claims against Emmons for fraud and negligent misrepresentation.

## Conclusion

Having sustained the City Claimants' sole issue as to all of their claims against Source Capital and as to their fraud and negligent misrepresentation claims against Emmons, we reverse the trial court's special appearance order as to those claims. But we affirm the trial court's order granting Emmons's special appearance on the breach of contract, promissory estoppel, conversion, and TTLA-violation claims.

/s/ Wade Birdwell
Wade Birdwell
Justice

Delivered: September 27, 2018